**Karen Lea PAXTON, Appellant,**

v.

**Clare Gene PAXTON, Appellee.**

No. 2–57818.

Supreme Court of Iowa.

July 31, 1975.

Rehearing Denied Aug. 27, 1975.

Stuart R. Lefstein, Katz, McAndrews, Durkee & Telleen, Rock Island, Ill., and George A. Goebel, Davenport, for appellant.

Michael W. Liebbe, Davenport, for appellee.

Heard by MOORE, C. J., and MASON, RAWLINGS, LeGRAND, and McCORMICK, JJ.

RAWLINGS, Justice.

Plaintiff mother appeals from modification of divorce decree transferring custody of minor child to defendant father. We affirm.

Plaintiff, Karen Lea Paxton, and defendant, Clare Gene Paxton, were married July 8, 1966. The sole issue of this marriage is Tamara, born January 6, 1967. The parties hereto were divorced July 9, 1968. Karen was thereby awarded custody of the child. Clare was ordered to pay $20 each week for Tamara's support.

Defendant attended Muscatine Community College in 1965, after graduating from high school. He there completed one year of study, then began working full-time at Magnus Model Laundry. Following the 1968 divorce defendant returned to said college, taking studies on a full-time basis while working part-time. He obtained a two year degree in the spring of 1970. At trial time defendant was employed by Fortney Concrete and Masonry Contractors as a bricklayer and cement finisher. His average yearly income between 1971 and 1973 was $10,000 to $11,000.

Prior to 1970 defendant, in some instances, failed to make the required support payments. In October 1970, plaintiff and defendant entered into an agreement whereby the latter was released from the aforesaid obligation. Plaintiff initiated this arrangement because she thought defendant wanted to obtain his four year college degree which would not be possible if he had to make the support payments. Plaintiff was under the impression he could do more for Tamara by so extending his education. But Clare did not then return to school. In April of 1972, he attempted to renegotiate the $20 per week support payments by offering to resume payments of $15 a week with liberalized visitation privileges. Plaintiff found this proposal unacceptable and these support-related negotiations were discontinued. At trial time defendant had paid nothing toward Tamara's support since the aforesaid 1970 agreement was signed.

After the 1968 divorce plaintiff and Tamara lived with Carol Oak, the former's mother in Muscatine, except for a six month period the latter part of 1973. The Oak residence is a large house with upstairs facilities which were occupied by plaintiff and her daughter. As best determinable Karen traveled daily to Davenport in 1973 for employment purposes. She there initially rented a one-room apartment where her personal things were kept. When too tired for the drive back to Muscatine plaintiff stayed in this apartment overnight. In August 1973, she moved into larger quarters and enrolled Tamara in a Davenport school.

Plaintiff held six different jobs and had changed residences three or four times within several years. At trial time she was employed by Thatcher Plastic Packaging and was earning approximately $200 weekly take-home pay.

Sometime after the move to Davenport in 1973, plaintiff began experiencing disciplinary problems with Tamara. Defendant testified he was contacted by plaintifff in early November 1973 and advised as to this problem. Plaintiff then requested that defendant care for Tamara over the coming weekend. He agreed to take the child for several days but upon arriving at plaintiff's residence discovered no one was there. The next day plaintiff again called defendant and asked him to take the child. He returned to Davenport, got the child and took her to Muscatine. Defendant testified to the effect plaintiff advised him later that evening he " * * * was going to have to come up and get Tammy's things, * * * was going to have to keep Tammy, * * was going to have to take care of her * * and provide for her, [and] that she was no longer going to do so."

Clare thereupon returned with Tamara to Karen's residence and the parties subsequently decided plaintiff would attempt to work out the disciplinary problem. Defendant further testified Karen telephoned him November 17, 1973, and after stating she was still having trouble with Tamara renewed her request that he care for the child. The next day defendant, accompanied by his attorney, Gary Allison, went to Davenport and got the child. Attorney Allison testified plaintiff informed him at this time she could no longer care for Tamara and having devoted all her time to raising the child it was defendant's turn. He additionally testified plaintiff stated she intended to locate in Las Vegas for an indefinite period where she apparently had a job at the Golden Nugget Casino. It was accordingly agreed defendant would care for the child until at least the close of the school year. When defendant did not return Tamara on the 19th he was contacted by plaintiff's mother. In course of a later phone call defendant was told by plaintiff she wanted the child returned. He then took Tamara to Mrs. Oak.

With regard to the above described events plaintiff testified she had in fact contacted defendant early in Novemer of 1973 and sought his assistance regarding the disciplinary problems she had been encountering with Tamara. As to the November 18, 1973 meeting, plaintiff testimonially stated no mention was made concerning defendant having custody of Tamara for the duration of the school year. Rather, as stated by plaintiff, her reason for contacting defendant and arranging the visit was to ask that he see Tamara more often. Plaintiff admitted defendant took Tamara November 18, 1973, but he was to have her only until the following morning. Karen denied telling Attorney Allison she had a job in Las Vegas or intended to move there.

Sometime after November 19, 1973, and prior to December 31, attorneys for the parties hereto effected an agreement whereby defendant would have custody of the child during daytime hours but she was to be returned to Carol Oak's home each night. Apparently plaintiff had moved back to Muscatine about this time and was again living with her mother.

November 30, 1973, defendant sought the instantly involved modification of the 1968 decree. Upon the filing of this application trial court entered an unchallenged ex parte order granting temporary custody of the child to defendant pending outcome of the modification hearing. Tamara has since remained with defendant.

December 11, 1973, plaintiff, apparently unaware of the aforesaid November 30 ex parte order, left Muscatine and on December 17 arrived in Las Vegas. In the meantime defendant removed Tamara from the Oak residence and contemporaneously advised plaintiff's mother as to the aforesaid custody order. As best determinable plaintiff was notified by her mother December 17, 1973, regarding said order. Karen did not leave Las Vegas until December 25, 1973 and arrived in Muscatine January 2, 1974. When questioned as to why she did not promptly leave Las Vegas upon being notified regarding the custody-related problem plaintiff stated she intended to return

immediately but her mother had said she would attempt to adjust the matter. Apparently plaintiff cut short her Las Vegas stay and, as above stated, did ultimately return to Muscatine.

December 31, 1973, defendant remarried.

February 8, 1974, presentation of evidence commenced. Upon submission of the case trial court made and entered findings of fact and attendant order of modification as sought by defendant.

In support of a reversal plaintiff contends defendant failed to show a material change of circumstances, subsequent to entry of the original decree, which justified a change of child custody.

I. Understandably trial court was in a better position than are we to observe the conduct of all witnesses, including the parties hereto, and determine the credibility of their testimony. See *Dunaway v. Dunaway*, 189 N.W.2d 480, 482 (Iowa 1971); Iowa R.Civ.P. 344(f)(7).

And as this court said in the case of *In re Marriage of Powers*, 226 N.W.2d 810, 811–812 (Iowa 1975):

"We have always accorded trial courts considerable discretion in matters of this kind even though we review the case *de novo*. We have consistently said that on applications for modification of custody arrangements, the party seeking the change in custody has the burden of showing the circumstances which existed at the time the original decree was entered have so materially and substantially changed that a transfer of custody is indicated. *Hagen v. Hagen*, 226 N.W.2d 13 (Iowa, filed February 19, 1975); *In re Marriage of Link*, 205 N.W.2d 751, 752 (Iowa 1973). The parent seeking to obtain custody of minor children from the other parent must show some superior claim based on his or her ability to minister, not equally, but more effectively to the well being of the children. *Hagen v. Hagen, supra; Crary v. Curtis*, 199 N.W.2d 319, 320 (Iowa 1972); *Spotts v. Spotts*, 197 N.W.2d 370, 371 (Iowa 1971).

The best interests of the children remain in this case as it does in all cases involving the question of custody, the first and governing consideration. *In re Marriage of Moorhead*, 224 N.W.2d 242, 244 (Iowa 1974); Rule 344(f)(15), Rules of Civil Procedure; *In re Marriage of Dawson*, 214 N.W.2d 131, 132 (Iowa 1974). In deciding that question courts seek neither to punish one parent nor to reward the other. *In re Marriage of Bare*, 203 N.W.2d 551, 554 (Iowa 1973)."

See also *In Interest of Kester*, 228 N.W.2d 107 (Iowa 1975).

II. Mindful of the foregoing we look again to the record. Dr. Larry Harris, Director of Professional Services for Family and Children's Service, testified at some length with reference to Tamara's emotional stability and needs. Dr. Harris saw the child on five occasions over a period of about six weeks. He observed Tamara demonstrated a tremendous sense of insecurity as the result of an uncertain environment, but could not determine with any degree of certainty whether plaintiff or defendant was responsible. This witness opined the child's most important need was consistency in education, residency and parental guidance. Dr. Harris further stated the girl is bright, has an outgoing personality and in a secure environment could become a stable individual. He further expressed the opinion that in her present home with defendant Tamara is adjusting well and indicates a sense of security.

Plaintiff is admittedly anxious to continue caring for the child. She has bestowed much love and affection upon her. The record also reveals Tamara was always clean and neatly dressed while in plaintiff's custody. It still remains, however, plaintiff has shuttled the child between Mrs. Oak's home and other housing on numerous occasions. This has in turn necessitated removal of Tamara from and enrollment in different schools. We have not overlooked the fact that defendant failed to pay support money after 1970 and it may, arguendo,

have been necessary for Karen to change her aforesaid employment-related residences for financial reasons. Looking to the other side of the page, however, the record reveals Karen spent in excess of $1100 for car repairs and clothing before departing for Las Vegas. She also paid in excess of $500 for an apartment bar. Briefly stated, these expenditures do not indicate Karen's employment shifts stemmed from inability to support herself and Tamara.

With little or no question the past conduct of both parents here involved has not been exemplary. Even more significantly, Karen was at one time convicted of assault and battery. On another occasion she was found guilty of disturbing the peace by making obscene phone calls.

Turning now to Clare, it is evident he manifested little interest in Tamara until called upon by Karen to assist with the above noted disciplinary problem. This past indifference appears to have stemmed, in part at least, from immaturity and thoughtlessness. To all appearances he has since matured considerably and upon remarriage purchased a home. At trial time defendant also evidenced a genuine concern for Tamara and stood prepared to make those parental sacrifices essential to her welfare.

As a preface to the award of Tamara's custody to her defendant father trial court summarized the foregoing by these findings:

"1. * * * subsequent to the marriage the defendant showed little interest and made no effort to contribute toward the support of his daughter.

"2. * * * the primary responsibility for the care and custody of Tamara was entrusted by plaintiff to the maternal grandmother.

"3. * * * both the plaintiff and defendant engaged in immoral conduct prior to the time of the hearing.

"4. * * * during the latter part of 1973 when plaintiff had custody of Tamara, she stated she was having difficulty raising her, and she felt that defendant should assume that responsibility.

"5. * * * at this time the defendant took the custody of Tamara, placed her in school at Muscatine, Iowa, and the plaintiff left for parts unknown for an indefinite period.

"6. * * * Tamara seems to have adapted to living with her father, who in turn is shown to have changed his prior indifference and is now very much concerned with the welfare of his daughter."

This court now holds the conditions contemplated when the 1968 divorce decree was entered did so materially and substantially change that Tamara's best interests made it appropriate and expedient for trial court to award custody of said child to defendant father by modification of the original decree.

Affirmed.